***ATTORNEY-CLIENT PRIVILEGE***

1        IN THE CIRCUIT COURT OF THE FIRST CIRCUIT

2                    STATE OF HAWAII

3  -----------------------------------------

4  SPORTS SHINKO (USA) CO., LTD., a Delaware

5  Corporation; SPORTS SHINKO (MILILANI)

6  CO., LTD., a Hawaii corporation, et al.,

7            Plaintiff,

8      vs.            Case No. 02-1-2766-11 (EEH)

9  RESORT MANAGEMENT SERVICES

10  (HAWAII), INC., a Hawaii corporation,

11  YASUO NISHIDA, SATOSHI KINOSHITA, et al.

12            Defendants.

13  -----------------------------------------

14

15      DEPOSITION OF SATOSHI KINOSHITA

16                  (Volume I)

17

18  Taken on behalf of the Plaintiff at Alston Hunt Floyd &

19  Ing, 1001 Bishop St., ASB Tower, 18th Floor, Honolulu,

20  Hawaii 96813, commencing at 9:08 a.m., Tuesday, April

21  19, 2005, pursuant to Notice.

22

23  BEFORE:   BARBARA ACOBA, CSR No. 412, RPR

24            Notary Public, State of Hawaii

25

EXHIBIT Q

***ATTORNEY-CLIENT PRIVILEGE***

```
 1    APPEARANCES:

 2    For Plaintiff:        GLENN MELCHINGER, Esq.

 3                          ALSTON HUNT FLOYD & ING

 4                          ASB Tower

 5                          1001 Bishop St., 18th Floor

 6                          Honolulu, Hawaii 96813

 7

 8    For Defendant SATOSHI KINOSHITA:

 9                          JOHN KOMEIJI, Esq.

10                          WATANABE ING KAWASHIMA & KOMEIJI

11                          First Hawaiian Center

12                          999 Bishop St., 23rd Floor

13                          Honolulu, Hawaii 96813

14

15

16    Also Present:         STEVEN SILVER - Interpreter

17

18

19

20

21

22

23

24

25
```

***ATTORNEY-CLIENT PRIVILEGE***
29

```
 1    with an outfit called Insigna that -- no, actually, it
 2    was Hotel Partners.  Ron Watanabe, if I'm not mistaken.
 3         Q.   And that was around 1996?
 4         A.   Yes.
 5         Q.   You testified you were instructed to sell
 6    Diamond Head Beach Hotel; is that right?
 7         A.   Yes.
 8         Q.   By who?
 9         A.   The president of the company.
10         Q.   Did he give any reason why you should sell
11    Diamond Head Beach Hotel?
12         A.   I don't really recall.  However, in Japan it's
13    not considered very polite to object to or question the
14    instructions you receive from the president of a
15    company.  And in the case of our company, the president
16    was essentially like a sole shareholder.  He wielded
17    complete authority, so it was even more the case in our
18    particular company.
19              And in addition to that, when I joined the
20    company in 1991, I was told by the president of the
21    company that given the fact that I was his child, that
22    if I didn't listen to him, then none of the other
23    employees and officers of the company would want to
24    listen to him.  So, no, I didn't question the president
25    about the reasons behind what he was instructing me to
```

RALPH ROSENBERG COURT REPORTERS
Honolulu, Hawaii  (808) 524-2090

1    do.

2        Q.    When you were acting as a director of the

3    Sports Shinko Japan company and were still living in

4    Japan, as part of your work for the, what do you call

5    it, financial analysis department, did you review

6    financial statements for the golf courses that were in

7    your -- within your block, within the block for which

8    you were the area manager?

9        A.    No.

10       Q.    What kind of financial information did you

11   review?  Was it the same type of information you

12   reviewed for the Hawaii subsidiaries?

13       A.    While I don't recall clearly, I believe that

14   the information I reviewed was more general than the

15   information that I was reviewing with respect to the

16   Hawaii subsidiaries.  Well, in particular, as it applied

17   to the situation in Japan, as an area manager all that

18   individuals in that position would do would be to

19   examine up to the point of operating profit.  That is to

20   take a look at the sales generated by operations and to

21   deduct from that the various costs incurred in

22   operations.  And so we would essentially review

23   operating results, if you will, up to the point of

24   operating profit and we didn't have knowledge, for

25   instance, with respect to debts.  We would just take a

***ATTORNEY-CLIENT PRIVILEGE***

1    Q.    That's what I'm asking you, what types of

2    direction did he give you, the president give you, about

3    anything about the Hawaii properties?  Let me ask it

4    this way:  What's the scope of your authority versus the

5    president's authority?

6    A.    I had virtually zero in the way of authority.

7    I would consult with the general managers of the various

8    golf course and hotel properties and then look to the

9    president to make decisions.

10   Q.    So back to my original question, so the scope

11   of the president's decision making authority was almost

12   plenary; is that right?

13   A.    Yes.  He had -- yes, virtually plenary

14   authority.

15   Q.    He would leave or would he leave day-to-day

16   management decisions to Jerry Kimoto or the managers of

17   the individual properties, for example?

18   A.    He would leave minor decision making to them,

19   yes.

20   Q.    But for bigger strategic or bigger business

21   decisions, he would give the direction first to you and

22   then it would -- break this down, the president would

23   make the bigger business decisions regarding the Hawaii

24   assets, yes?

25   A.    Yes.

1              (Exhibit 29 marked for identif

2    BY MR. MELCHINGER:

Note: Deposition Exhibit 29, which is also referred to below as "P & S agreement", is attached as Exhibit S to CSOF (excerpts)

3        Q.   Showing you what's been marked as Exhibit 29 to

4    your deposition, and wonder if you recognize this

5    document?

6        A.   I do.

7        Q.   Okay.  And what is this document, please?

8        A.   This is the purchase and sale agreement between

9    Sports Shinko and the KG Group for the hotel and the

10   golf courses.

11            MR. KOMEIJI:  Again, we rely upon you that this

12   is a complete set.  Again, no inferences are being

13   drawn, I just put that for the record.

14            MR. MELCHINGER:  I understand.  And I'll

15   represent for the record that this is taken from the

16   McCorriston's files, again, that were produced to us in

17   response to a Rule 2004 exam in the Section 304

18   proceeding in the Bankruptcy Court.

19   BY MR. MELCHINGER:

20       Q.   On pages 27 and 28, is that your signature that

21   appears on those pages?

22       A.   Yes.

23       Q.   And you're signing on behalf of all the Sports

24   Shinko companies that are party to this agreement; is

25   that right?

***ATTORNEY-CLIENT PRIVILEGE***

1     A.    Yes.   I was instructed to sign by the

2   president.

3     Q.    Now, this was on the 15th and the closing was

4   scheduled, I think you said, for the 28th in the

5   agreement.   Between -- well, during that 13-day period

6   or so, what do you recall about the negotiations with

7   KG, if anything, to assume the management agreements

8   with RMS?

9     A.    Well, RMS was a separate and independent

10  third-party entity, if you will, and so all that I did

11  was that I recommended that if it was okay with the

12  other side, that we'd like to see them continue to use

13  RMS as RMS had been managing Sports Shinko's hotels and

14  golf courses.

15    Q.    How involved were you with the negotiations

16  with KG on that issue, the assumption of the RMS

17  management agreements?

18    A.    To the best of my recollection, that did not

19  take place during the roughly 13 days between the date

20  of the signing of the contract and the date of the

21  closing, but took place prior to that.

22         (Exhibit 30 marked for identification.)

23  BY MR. MELCHINGER:

24    Q.    Show you what's been marked Exhibit 30 to your

25  deposition.   Tell me if you've seen that before, please.

***ATTORNEY-CLIENT PRIVILEGE***                    262

```
1    with the president; is that right?

2         A.   Yes.

3         Q.   It says he was at an undisclosed hotel.  Was

4    that a hotel in Japan or in Hawaii?

5         A.   Japan.

6         Q.   And it says he asked you to send the P and S

7    agreement.  That was the purchase and sale agreement

8    with KG; is that right?

9         A.   Yes.

10        Q.   Did you translate the agreement for him?

11        A.   Yes.

12        Q.   And this is before it was signed; is that

13   right?

14        A.   Yes.

15        Q.   So you sent him, was it a full Japanese

16   translation or an abbreviated Japanese translation?

17   What did you send to him?

18        A.   I sent him both a summary and a full

19   translation.

20        Q.   And at this time he said he was -- did he say

21   he was negotiating with the RCC?

22        A.   Yes.

23        Q.   And he needed something from you to show to the

24   RCC; is that right?

25        A.   Yes.
```

RALPH ROSENBERG COURT REPORTERS
Honolulu, Hawaii  (808) 524-2090